**HARDCO Inc. dba HARDY CONSTRUCTION, Plaintiff**

**v.**

**A.P. LUTALI and SUSANA LUTALI, Defendants**

High Court of American Samoa
Trial Division

CA No. 111-88

January 16, 1990

Before REES, Associate Justice, TAUANU'U, Chief Associate Judge, and MATA'UTIA, Associate Judge.

Counsel: For Plaintiff, Charles V. Ala'ilima
 For Defendants, Togiola T.A. Tulafono

Plaintiff (hereinafter sometimes referred to as "Hardy") built an extension or addition to a home belonging to defendants A.P. and Susana Lutali. The Lutalis made payments in a total amount of $82,458 but declined to pay several subsequent invoices sent by plaintiff in a total amount of $47,986. Hardy brought this action to recover the unpaid balance.

The Lutalis contend that Hardy agreed to do the entire job for $65,000; that the work was substandard in various ways; and that Hardy fraudulently billed them for labor and materials not actually employed in the building of the addition. By way of counterclaim they demand $97,000 in compensation for the damage they claim to have suffered on account of these alleged breaches of the contract, as well as for punitive damages and attorney fees.

## I. Facts

We find the facts to be as follows:

1) In late 1985 or early 1986, Mr. and Mrs. Lutali met with Don Hardy, the managing officer and co-owner of the plaintiff corporation, to discuss the possibility of his building an extension to their home in Ili'ili. A.P. Lutali and Don Hardy had been friends for several years.

2) The Lutalis initially wished only to extend by a few feet the length of the existing bedrooms on their one-story house. At the meeting with Mr. Hardy, however, the discussion eventually focussed on the possibility of a discrete two-story addition containing several new rooms.

2

3) At this meeting or shortly thereafter, Mr. Hardy may have given a verbal estimate of $65,000 for the two-story addition.

4) On May 27, 1986, Mr. Hardy delivered to Lutali's office a letter estimating that the addition would "take three months to complete and would cost approximately $75,000." The letter also stated that the addition "would be constructed on the same design as the present house" and that "[a]s all materials would be ordered from the U.S.A., the quality would be of the highest."

5) In June or July of 1986, Mr. Hardy arranged for plans to be drawn up depicting the proposed addition. Although it is not clear whether the Lutalis actually reviewed these plans, the preponderance of the evidence is to the effect that they at least had the opportunity to do so.

6) Don Hardy testified that the initial plan for the addition (on which he says his $75,000 estimate was based) called for a structure 48 feet long, and that at some point the Lutalis ordered the length extended to 53 feet so that it would be the same as the length of their existing house. While a 48 foot extension may have been discussed at some early stage of the negotiations, the evidence does not support a finding that a change in the size of the proposed structure was made between May 27 when Mr. Hardy gave the $75,000 estimate and July when the plans were drawn up. The voluminous documentary evidence with which we have been presented includes no plans for a 48-foot structure and no other documentary evidence reflecting a change in the parties' understanding. Neither defendant A.P. Lutali nor witness Epenefa Te'o, the person retained by Hardy to draw the plans, recalls a revision during this period. We therefore find that the structure for which Mr. Hardy ordered plans to be drawn in June or July of 1986 was the same structure he had offered on May 27 to build for approximately $75,000.

7) In July or early August Mr. and Mrs. Lutali met with Don Hardy and his wife, the other co-owner of the plaintiff corporation, to discuss flooring materials, bathroom fixtures, and so forth. The Lutalis selected materials of relatively high quality, such as parquet hardwood floors and ceramic tiles. Neither A.P. Lutali nor Don Hardy recalls any discussion of the price of these materials. Hardy testified that he assumed the Lutalis understood that their selection of such materials would increase the price of the structure; Lutali testified that he believed he was entitled to high quality materials for the price that had already been agreed upon.

3

8) During this period the parties discussed having Hardy renovate the existing portion of the Lutali home. The proposed renovations included a master bathroom, a "ladies' lounge," and improvements to the kitchen.

9) On August 7, 1986, Don Hardy wrote a letter to Susana Lutali enclosing a list of the materials he had ordered for the addition. The total cost to the Lutalis was to be $50,905.17. Hardy noted that it was "very possible" that some material might be "leftover" and therefore available for use on the renovations to the existing structure, and also that he "might have missed something which we can get on the next shipment when we order for your master bath, Ladies lounge, and the kitchen."

10) At some time between August 7 and October 7, the Lutalis paid the $50,905 invoice for materials and an additional $9,000 for freight.

11) Construction on the addition began in late August or early September.

12) On September 15 Hardy sent the Lutalis an additional invoice in the amount of $13,276 ($6,516 for additional materials and $6,760 for labor).

13) On October 4 Hardy sent yet another invoice for $9,277 ($677 for materials and $8,600 for labor).

14) On October 7 Hardy furnished the Lutalis with a written estimate of the entire amount that would be necessary to finish both the two-story addition and the renovations to the existing structure. This estimate was for $148,825, not including the $59,905 the Lutalis had already paid. It breaks down as follows:

Material, Labor, and Freight already billed for
the addition (including the $59,905 already paid): $82,458

Material and freight for remodeling the existing
structure (apparently for materials already ordered
or about to be ordered by Hardy from his supplier
in the United States): 81,272

"Estimated Material & Labor to complete job": 45,000

4

| | |
|---|---|
| Total: | $208,730 |
| Minus amount already paid: | - 59,905 |
| Total cost to complete both projects: | $148,825 |

15) It was not made clear on this invoice how much of the $45,000 "to complete job" was for completing the two-story addition and how much was for the proposed renovations to the older part of the house. Taking account of the evidence that some progress had been made on the addition whereas the renovations were barely begun, we estimate that no less than $10,000 and no more than $20,000 of the remaining $45,000 was to complete the addition. Thus Hardy's revised estimate of the total cost of the addition, as of October 7, was between $92,458 and $102,458.

16) Shortly after receipt of the October 7 estimate, the Lutalis told Hardy they could not afford the proposed renovations to the pre-existing structure. They directed him to proceed with the addition but not with the renovations. (We have insufficient evidence to determine whether the parties ever had a contract with regard to the proposed renovations to the pre-existing structure. It appears that Hardy had begun work on them prior to October 7, yet it also appears that the Lutalis made it clear they did not want the renovations as soon as they were given a firm estimate of the cost. Since neither party seeks relief for the breach of any agreement involving renovations to the pre-existing structure, we need not conclude whether there was such an agreement.)

17) During October the Hardys paid the September 15 and October 4 invoices described in paragraphs 12 and 13 above. This brought the total amount they had paid to $82,458.

18) Also in or around October, the Lutalis inspected the addition and decided that the bedrooms in it were too small. They therefore ordered Hardy to extend the width of the addition by four feet. (The new dimensions were to be 30' x 53' rather than 26' x 53'.) Hardy testified that this change increased the total cost of the project by a large (although unspecified) amount, since the structure was already substantially built; it was necessary not only to knock out walls and build new ones, but also to move the pillars that supported the second floor. Hardy also testified, however, that he did not discuss the additional cost with the Lutalis but simply assumed they would pay whatever the cost turned out to be. Lutali, on the other hand, testified that he assumed the

5

changes would be included in the original price since they were necessary to make the addition conform to its original purpose, which was to have larger bedrooms.

19) Hardy continued working on the addition until February of 1987.

20) Hardy submitted additional invoices on October 31, 1986; December 2, 1986; January 6, 1987; January 19, 1987; February 1, 1987; and February 28, 1987. The total amount of these invoices was $47,986. Of this amount $14,266 was for material (including freight) and $33,720 was for labor. None of these additional invoices were paid by the Lutalis.

21) Further communication between the parties consisted of several inquiries by Don Hardy about the unpaid invoices and at least three letters from Lutali (May 11, June 18, and August 10, 1987) about defects in the construction. On one occasion, according to Hardy, he attempted to visit Lutali at his office and was shown the door. This lawsuit followed.

22) The Lutalis contend that Hardy billed them for materials which he used on other projects. Aside from one instance in which Hardy concedes having billed the Lutalis for $200 to $300 in freight charges that should have been billed to another customer, the evidence does not support this contention. The charge appears to have been inspired by this Court's opinion in *Hardy v. Anderson*, 9 A.S.R.2d 79 (1988), in which we found that Mr. or Mrs. Hardy had altered an invoice in order to make it appear that certain lumber had been used on one project rather than another. As it happens, the evidence in the present case reveals that the phantom lumber in *Hardy v. Anderson* was the very lumber that had already been billed to the Lutalis. While it is always gratifying to be treated to a surprise visit to old stomping grounds --- and doubly gratifying to be presented with new evidence to support old conclusions --- the Court is unable to find this evidence particularly helpful to the present defendants. Rather, it supports Hardy's present position that the lumber billed to the Lutalis, or at least the great majority of it, was the same lumber actually used on the addition to their house.

23) Specifically, Hardy submitted invoices to the Lutalis for materials and freight in the total amount of $81,364. Hardy testified that he charges his customers a "retail" figure equal to about 133% of the cost of materials to him. The invoices to and from Hardy reveal that he

6

charged the Lutalis amounts varying from 116% to 192% of the cost of particular items to him. Assuming that all the items billed to the Lutalis were actually used on the project, it would appear that the materials for the addition cost Hardy between $50,000 and $60,000 including freight charges. With regard to fixtures and other items that are particular and identifiable, our examination of the invoices reveals that these items do correspond to the number apparently used in the addition.

24) The evidence does, however, support the Lutalis' contention that at various times during the course of the project Mr. Hardy and his employees carried off quantities of lumber and other building materials from the job site. Mr. Hardy himself testified that he took only about one truckload of lumber and that this was old lumber torn from the Lutalis' house in order to make doorways to the extension. The testimony of witness Mausa, the Lutalis' housekeeper who appeared to be an honest and relatively disinterested witness, was that the quantity was greater and included other materials. The preponderance of the evidence is to the effect that there were, as Mr. Hardy had originally estimated there might be, some lumber and other materials left over from the original shipment.

25) The evidence also supports the Lutalis' contention that Hardy billed substantially more for labor costs than the amount actually incurred. Company records show that the total amount paid to construction workers on the project was $11,194.05. The addition of a 12% surcharge (the figure Hardy used to estimate employer Social Security payments and other costs associated with the employment of these workers) brings the total labor cost to $12,537.34. In contrast, the amount billed to the Lutalis was $49,080. The $37,000 difference appears to have been allocated to payment of Mr. and Mrs. Hardy and members of their immediate family for supervisory and administrative services. (Mr. Hardy did supervise the project, although the best evidence is that he visited the site for only an hour or two each working day; the evidence of services performed by Mrs. Hardy in connection with the project are that she participated in one meeting with the Lutalis and performed general bookkeeping services for the company.)

26) The Lutalis' contention that the work was defective is supported by the evidence to the following extent:
a) Electrical problems that cost about $200 to repair.
b) Plumbing problems that cost $262 to repair.
c) A leaking septic tank. The repair bills for this item were commingled with bills for other projects, including the renovations to the

pre-existing portion of the house and the construction of a master bathroom adjacent to the addition, which the Lutalis apparently decided to have done by contractors other than Hardy. From the evidence before us we can conclude only that the septic tank probably cost between $300 and $1,000 to repair.

d) Persistent leakage through the first-floor ceiling, caused by settlement of water on a deck adjacent to the second floor. The evidence is that this problem was caused by Hardy's failure to build the roof so as to overhang the deck, as provided by the plans for the project; by Hardy's failure to build the deck so as to slope slightly away from the adjoining wall; by Hardy's failure to provide protective "flashing" at the intersection of the deck and the exterior wall; and perhaps also by the addition of an extra layer of boards under the deck. (This last feature was requested by the Lutalis for cosmetic reasons; Hardy incorporated it without warning the Lutalis of any problems that might result.) This problem has resulted in water damage, principally to the acoustical tiles on the first-floor ceiling. Replacing the damaged tiles has cost the Lutalis about $196 for materials and several hundred dollars for labor. From the evidence of other construction costs submitted by both parties, we estimate that building a four-foot overhang along the 53-foot length of the roof and installing the flashing will almost certainly cost over two thousand dollars and almost as certainly less than five thousand; this range of figures is unfortunately the most precise estimate we can make on the present record.

e) A large crevice in the floor caused by the uneven laying of the foundation. Again, the evidence does not support a precise estimate of the cost to repair this problem. The lowest possible estimate --- based on what appeared to be the wildly optimistic testimony of an expert witness for Hardy to the effect that a plastic solution could be poured over the foundation so as to level it --- would probably run into thousands of dollars, taking into account not only the acquisition and pouring of such material but also the removal and replacement of 1,000 square feet of parquet tiles. This technique was unknown, however, to the Lutalis' expert witness; if it should prove impossible to repair the foundation without tearing it up and starting over, the cost could amount to many thousands of dollars.

27) Another problem, having to do with water welling up from under the foundation, has not been shown to have been caused by any defect in Hardy's design or workmanship. The problem did not appear until about two years after construction was completed, and the Lutalis' own expert witness conceded that it might be the result of causes unrelated to Hardy's work.

8

From this evidence we conclude that Hardy originally contracted to build the Lutalis a 53' x 26' structure composed of the "highest quality materials" for "approximately $75,000," and should be held to this contract; that Hardy is nevertheless entitled to some compensation in addition to the contract price for the extra four feet of width added to the structure at the insistence of the Lutalis; and that the Lutalis are entitled to a reduction corresponding to the diminution in the value of the structure attributable to its several defects.

## II. The Contract

The contract between the parties came into being when the Lutalis, having received Hardy's $75,000 written estimate, told Hardy to begin construction. This event occurred at the very latest in July or early August when the Lutalis and the Hardys met for the purpose of choosing the specific materials that would be used in the house.

Contrary to Hardy's contention that the Lutalis' choice of materials amounted to an implicit agreement to pay more than the contract price, it was perfectly consistent with the term of Hardy's offer providing that all materials would be "of the highest quality." Hardy testified that his $75,000 estimate was based on far less expensive materials, such as vinyl tile rather than wooden floors in the living areas. A reasonable consumer, however, can hardly be assumed to understand the term "highest quality materials" as including vinyl tile but not wood. In the Court's experience Mr. Hardy is the very first person who has ever suggested that a "highest quality" bedroom or living room floor might be made of vinyl; indeed, although there may be some flooring material that is generally regarded as of lower quality than vinyl tile, the Court is unable to name such a substance.

Mr. Hardy points out, however, that the phrase "the quality would be of the highest" must be construed in light of the modifying language, "As all material would be ordered from the U.S.A." On balance, however, this does more harm than good to Hardy's case. While it is not syntactically impossible to read the language in question as making a distinction between high-quality "Made in the U.S.A." vinyl living room floors and inferior Oriental ones, to a prospective buyer in American Samoa the invocation of the United States in connection with "highest quality" materials is far more likely to reinforce the impression that everything will be first-rate, not third-or-fourth-rate.

In the present case, moreover, the Hardys showed the Lutalis catalogues containing materials that were of genuinely high quality. Having assured their customers that $75,000 would pay for a structure in which all materials would be of the highest quality, the Hardys knew or should have known that the customers might understand this assurance to include the particular materials they were being shown. Yet the Hardys made no suggestion to the contrary. The contract was therefore enforceable in accordance with the Lutalis' understanding that the $75,000 price included the materials they selected. *See* Restatement (Second) of Contracts § 20(2) (1981).

The Lutalis argue that they are accordingly entitled to a refund of the amount they paid Hardy in excess of the contract price. It is important to notice, however, that the estimate was for "approximately" $75,000. The Lutalis paid Hardy $82,458, slightly less than 10% over the estimate. If both parties had otherwise performed in accordance with the original contract --- if there had been no changes and no defects ---. we would hold the $82,458 that was billed and paid to be in accordance with the contract price of "approximately" $75,000.

Hardy contends, on the other hand, that by receiving and paying invoices suggesting that the actual cost of completing construction would be well over the $75,000 estimate, the Lutalis implicitly agreed to pay whatever the cost might eventually turn out to be. This contention is at odds with the facts and also with the law. The initial invoice received by the Lutalis on August 7 was for $50,905 plus an unspecified freight charge. This invoice appeared to be for substantially all the materials that would be necessary. It was not unreasonable to assume that the labor plus freight and any remaining materials would cost no more than $30,000 or so. (Construction was supposed to take only three months; Hardy's actual labor costs over a somewhat longer period amounted to about $12,000.) By late September or early October, when the Lutalis had reason to believe that Hardy's bills might substantially exceed $75,000, they already had a massive investment in the project and were in no position to call it off. Under these circumstances neither their payment of two invoices which did not bring their total payments beyond the original estimate of "approximately $75,000," nor their silence in the face of invoices which did far exceed the contract price, can fairly be regarded as consent to a dramatic and one-sided modification of the contract.

There was, moreover, no consideration for such a modification in the absence of changed circumstances or other special equitable

10

considerations. By paying $82,458 the Lutalis had already fully performed their side of the bargain whereas Hardy proposed to do nothing for $100,000 that he was not already obliged to do for approximately $75,000. "Performance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration . . . ." Restatement (Second) of Contracts, *supra*, at § 73; *see Lingenfelder v. Wainwright Brewery Co.*, 15 S.W. 844 (Mo. 1891).

### III. Quantum Meruit

Somewhat later in October, however, the Lutalis ordered Hardy to undertake additional work that was not included in the original agreement. The structure being erected was 53 feet long by 26 feet wide, in accordance with the plans; the Lutalis directed that it be extended so as to be 30 feet wide.

Defendant A.P. Lutali testified that this change was necessary in order to provide large bedrooms as originally contemplated, and that he therefore assumed Hardy would make the change without increasing the price. Asked whether he had seen the plans which had been drawn up in July, and which clearly indicate the room dimensions to which he later objected, the witness said he did not recall but that he does not really understand plans. Lutali, however, is a highly intelligent man and a licensed legal practitioner who conducted for many years an extensive practice in the area of real property law. At the time of the events involved in this lawsuit he was serving as Governor of the Territory. Even if he did have difficulty reading the plans, he knew or should have known that the construction he was about to order would attempt to replicate them and that it was therefore important to take such steps as were necessary to know what was in them. He surely understood that the two-story addition was different in many important ways from the extension he had initially discussed with Hardy, and it was unreasonable simply to assume that any particular feature of the original concept was incorporated into the final plans.

It was perhaps even more unreasonable for the Lutalis to assume in October --- after the October 7 invoice had given them reason to know of Hardy's desire to do business on a "cost-plus" basis rather than in accordance with the original estimate --- that Hardy would tear out the exterior walls he had already built, add 424 square feet of floor space, and rebuild the walls, all at no extra charge.

11

It was just as unreasonable, however, for Hardy to assume that the Lutalis, who had recently cited financial reasons for cancelling their plans to renovate the older portion of the house, had agreed to a new contract by which he would add four feet to the new addition and they would pay whatever he asked.

With regard to the work involved in this four-foot extension, the parties did not even attempt to reach an agreement on the price; instead each party chose to proceed in deliberate disregard of the materially different interpretation which he surely knew the other party would eventually place on the arrangement, each apparently believing that it would be strategically preferable to resolve this difference after the work was done. The result was that the parties never made a contract with respect to this portion of the work. *See* Restatement (Second) of Contracts, *supra*, at § 20(1).

Accordingly, the revision ordered by Lutali affords no contractual basis for Hardy's claim that Lutali owes $47,986 over and above the $82,458 he has already paid. (This is especially true in light of the October 7 invoice, which reveals that Hardy was already well over the original budget before Lutali ordered the revision; a substantial portion of the $47,986 now demanded, therefore, has nothing to do with the revision and cannot possibly be justified by reference to it.) It does not follow, however, that the Lutalis get the extra 424 square feet for free. Rather, the court must apply the doctrine of quantum meruit to award Hardy the value of the benefit conferred on the Lutalis by the work done beyond that required by the original contract. *Cf. Hardy v. Anderson, supra* at 83.

The only evidence we have of the benefit conferred by the additional work is the value the parties agreed to place on the work originally scheduled. If a 53' x 26' two-story addition is worth approximately $75,000, then an identical structure approximately one-sixth larger (53' x 30') should be worth about $12,500 more. Hardy might also be entitled to greater compensation for revising a structure that was already substantially built than if he had simply built the extra square footage from the ground up, since the cost of construction --- and therefore, arguably, the value of the services rendered --- was greater. *See Evans v. Mason*, 308 P.2d 245 (Ariz. 1957). It is not clear, however, that the extra expense to Hardy increased the value of the benefit conferred upon Lutali, which is the traditional measure of damages under quantum meruit. *See Hill v. Waxberg*, 237 F.2d 936, 939 (9th Cir. 1956) ("[R]estitution is properly limited to the value of the

12

benefit which was acquired.") In any case, Hardy's equitable claim to compensation beyond the value of the benefit acquired by the Lutalis is substantially weakened by his failure to apprise the Lutalis of the extent of the work that would be entailed by the revision they had requested. While it might go without saying that the walls would have to be torn out and rebuilt, there was no reason to assume that the Lutalis would understand that the structural supports for the whole second floor would need to be moved.

## IV. Offsetting Damages

Depending on the resolution of these questions, the revision would appear to entitle Hardy to at least $12,500 and perhaps as much as $20,000. Against such entitlement, however, it is necessary to offset the damages suffered by the Lutalis on account of defects in the construction. While the evidence of the amount owed by Hardy on account of such damages is at least as imprecise as the evidence of the amount owing to Hardy for the revisions, the two figures are of the same order of magnitude.

On the present record we cannot conclude that Hardy is entitled to quantum meruit recovery beyond the $82,458 already received, since we have insufficient evidence on which to find that the value of the extra services he performed exceeds the amount of the damages suffered by the Lutalis on account of Hardy's defective performance. Nor can we conclude, however, that the Lutalis have proved damages in excess of the benefit conferred on them by the additional construction.

Preservation of the status quo, aside from being practically compelled by the rule that each party bears the burden of proving his own damages, also seems a just result from the standpoint of all parties. The Lutalis have already spent between $1,000 and $2,000 to repair defects in Hardy's performance. (This estimate excludes amounts spent for such items as the new master bathroom and the "ladies' lounge," which were not part of the addition or of this case.) By spending another $2,000 to $6,000 they can probably repair all the defects except the crevice in the floor. They will then have paid from $85,000 to $90,000 for a building that is one-sixth larger than the one they originally agreed to purchase for "approximately" $75,000, but which has an uneven floor. If it turns out that the floor can be fixed for an additional two or three thousand dollars, they can have a flawless building one-and-one-sixth times as large as the one they originally agreed to purchase, for approximately one-and-one-sixth times the amount they agreed to pay.

13

If the cost of repairing the defect in the floor should prove so high that a reasonable person would prefer simply to make whatever cosmetic repairs are possible and live with the result, then the Lutalis will be left with an imperfect but habitable structure for a somewhat lower price. In such a case the measure of damages for defective performance is not the cost of repairing the defect but the difference in value between the benefit conferred by the defective performance and the benefit that would have been conferred by the promised performance. *See Jacob & Youngs v. Kent*, 129 N.E. 889, 891 (N.Y. 1921) (Cardozo, J.):

> The owner is entitled to the money which will permit him to complete, unless the cost of completion is grossly and unfairly out of proportion to the good to be attained. When that is true, the measure is the difference in value.

Nor is a denial of further payment particularly harsh toward Hardy. The record reflects that Hardy's total expenses, excluding payment to the Hardys themselves, were between $62,000 and $72,000 for all work including the additional 424 feet. Their compensation for their own efforts in connection with the Lutali project, therefore, is between $10,000 and $20,000. They also appear to have recovered an indeterminable quantity of unidentified excess building materials. While perhaps not handsome by the standards of the construction industry, this measure of compensation is hardly unfair in light of the serious problems that developed with the Lutali project.

V. *Order*

Accordingly, both the complaint and the counterclaim are dismissed.

It is so ordered.